Filed 6/15/26  P. v. Clark CA5
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F085335 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. CF80264587) |
| AL RICKEY CLARK, | **OPINION** |
| Defendant and Appellant. | |

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  John F. Vogt, Judge.

Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Cameron M. Goodman and Christopher J. Rench, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]      Before Hill, P. J., Detjen, J. and Meehan, J.

## INTRODUCTION

This matter is before us on transfer from our Supreme Court for reconsideration in light of *People v. Emanuel* (2025) 17 Cal.5th 867 (*Emanuel*), which considered the sufficiency of evidence supporting a finding of reckless indifference to human life for purposes of first degree felony murder liability (Pen. Code, § 189, subd. (e)(3))[1] in an evidentiary hearing under section 1172.6. In accordance with the direction of the Supreme Court, we vacated our earlier decision and notified the parties they may file supplemental briefs.

In 1981, appellant Al Rickey Clark pleaded guilty to the second degree murder of Daniel Torrez. In 2021, appellant filed a petition for resentencing in light of the passage of Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437). The court found appellant had established a prima facie basis for resentencing, issued an order to show cause, and held an evidentiary hearing. (§ 1172.6, subds. (c), (d).) On October 19, 2022, after an evidentiary hearing, the court denied the petition, finding that appellant was a major participant who acted with reckless indifference to human life in the murder of Torrez.

Appellant challenges the denial of his petition after the evidentiary hearing, asserting the evidence is insufficient to establish he is ineligible for resentencing, and he contends we should review the trial court's factual findings de novo.

Having now considered our high court's decision in *Emanuel* and the parties' supplemental briefs, we conclude the trial court's findings that appellant was a major participant who acted with reckless indifference to human life are supported by substantial evidence, and we affirm the order denying the petition.

---

[1]    All further statutory references are to the Penal Code unless indicated otherwise.

2.

# FACTUAL BACKGROUND

## I. Evidence From the Evidentiary Hearing

The evidence admitted at the evidentiary hearing shows Ronald Equarte, Sanders Bledsaw and appellant hatched a plan to steal a vehicle and rob a bank. On July 17, 1980, after being unable to find a vehicle to steal, appellant suggested they carjack one, put the driver in the trunk, and commit the bank robbery in the stolen car while the kidnapped driver remained in the trunk. They drove around for a few hours, searching for a victim, and appellant selected someone drying his car at a car wash. Bledsaw— carrying a loaded shogun—and appellant got out of Equarte's car, ambushed the victim, later identified as Daniel Torrez, and tried to shove him into the trunk of his car. Torrez fought back, Bledsaw ended up shooting Torrez, appellant and Bledsaw fled to Equarte's car, and they escaped the scene. The evidence about the shooting was acquired almost exclusively from the transcript of a 1981 preliminary hearing where Equarte, appellant's ex-girlfriend (Allyson D.), and a percipient witness to the shooting (Edward L.) all testified.

Equarte testified he had known Bledsaw since grade school and had met appellant in March 1980—together they had participated in at least three robberies between March and July 1980. Equarte had participated in six robberies prior to Torrez's murder, and in all but the first robbery in March, Equarte was armed with the same loaded, sawed-off shotgun that he had purchased in March after his first robbery.

Appellant lived with his girlfriend, Allyson. In June 1980, Bledsaw was at their apartment, and she heard appellant and Bledsaw talking about a plan to rob a bank. They were going to steal a car from a senior citizen or someone who could not fight back so no one would get hurt, put the person in the trunk, and use the car to commit the robbery.

According to Equarte, he met with Bledsaw and appellant at the house of Bledsaw's brother (Solomon) to plan the robbery on July 16, 1980. In that conversation, appellant asserted they should "pull" a bank robbery because they were not getting

3.

enough money from the robberies they had already committed. None of them wanted to use their own car, so Equarte suggested they steal one. Equarte knew it was easier to steal 1960 to 1965 Chevrolets, and he had a few keys that were known to start those cars. Appellant mentioned a few banks that could be possible targets and appeared the easiest to rob. They agreed to meet at appellant's apartment the next morning.

The following morning, Equarte drove his car to appellant's apartment with his loaded shotgun in the backseat, meeting appellant and Bledsaw there. Equarte and Bledsaw were planning to steal the car, so appellant drove them around in his car for a few hours. They did not find a satisfactory car to steal, so appellant suggested they "[t]ake one" from someone. Equarte pointed out a police report would get filed right away and they would not have time to use the car for the robbery. Appellant responded they would just take the driver, too. The plan was to put the driver in the trunk and keep him there while they committed the robbery. There was no real discussion about what would be done with the driver after the robbery, and Equarte assumed they would just park the car and leave it afterwards.

Appellant suggested they switch cars since Equarte was not going to be the one to steal the car anymore. They went back to appellant's apartment about 11:00 a.m. and switched cars; they transferred Equarte's gun, which both Bledsaw and appellant knew was loaded, drove to Solomon's house where appellant parked his car, and they set out in Equarte's car.

Appellant told the others he would handle the gun, but Equarte had heard appellant make statements in the past that if "he had to use a gun that he wouldn't hesitate on using it." Equarte had known Bledsaw for years and had never seen him be violent with anyone, so Equarte wanted Bledsaw to have the gun. Bledsaw and appellant agreed to that arrangement; appellant told Bledsaw that he should keep his hand off the trigger unless he planned on using it, and Equarte told Bledsaw that the trigger was "fairly easy" to pull.

4.

The three men drove around for a couple of hours looking for a suitable person. When they turned onto a street next to a car wash, appellant said, "'Ooh! Ooh! That's it. That's it. Right there—uh—make a right. Make a right.'" Appellant directed Equarte to the car wash, where a slim man (Torrez), who looked to weigh approximately 100 pounds, was drying his car with the trunk up. Equarte pulled the car into one of the wash stalls. Appellant and Bledsaw immediately got out of the car; Bledsaw had the gun, and he and appellant walked to the area where Torrez had just been seen, out of Equarte's sight.

Equarte never saw Torrez once he parked his car—the drying area was not visible from where Equarte's car was parked in the washing stall. After appellant and Bledsaw were out of sight, Equarte heard loud screaming and struggling. A few minutes later, he heard appellant say, "'Let's go'" and then Equarte restarted the car and started backing it up out of the stall. Appellant reappeared and got in the front seat; then Bledsaw also came into view, Equarte saw Bledsaw turn around facing toward Torrez and heard him say, "'Get back. Do you want to get shot?'" Then he saw Bledsaw pull the trigger and heard the blast of the gun. The gun jumped out of Bledsaw's hands, Bledsaw bent down to pick it up, and ran to the car and jumped into the backseat and laid down. As soon as everyone was in the car, Equarte panicked, took off and went to Solomon's house.

Edward L., a 16-year-old who lived in the house behind the car wash, had heard and witnessed portions of the incident. He was outside smoking a cigarette about 1:00 p.m. when he heard loud voices that sounded like an argument coming from the car wash. He went to the fence that separated his backyard from the car wash, looked over, and saw a "skinny" man he estimated to weigh about 95 pounds washing a black Chevrolet with its trunk open, and another man was standing on the other side of the car leaning up against a pole. There was no conversation going on between the two when Edward looked over the fence, and it did not appear to be a fight. Edward went back and sat down to finish his cigarette.

The arguing and yelling resumed, and Edward heard someone say, "'No, man.'" He heard more yelling and went back to the fence to look again. The slim man who had been washing his car was about five feet from the rear of the car, and the car's trunk lid was still open. He was facing the same individual Edward had seen originally and another man standing about 30 feet away over by the washing area wall—one of the men had what looked like a Michelob bottle in his hands. They were not yelling when he looked over the fence, but then either a few seconds or a few minutes later he heard a blast from the washing area and the slim man who had been washing the car fell to the ground. Edward saw the other two men running away. Edward ran toward his house and told his brother to call the police because someone had been shot, he then jumped the fence, and found the slim man lying by his car and bleeding from his side. The man was mumbling, and Edward could not make out what he was saying. From the time Edward first heard yelling to the time the victim was shot was approximately seven to ten minutes.

At Solomon's house after they fled the car wash, Equarte parked his car, Solomon came out and the four of them talked outside. Bledsaw told Solomon what had happened, and appellant said Bledsaw had done the right thing and he would have done the same thing himself. Bledsaw wanted to get rid of the gun, and Equarte agreed, so Solomon took the gun. Equarte asked Bledsaw and appellant what had happened, and appellant said they "couldn't get the guy … couldn't get the trunk shut because the guy's hand was between the lock and the latch." Appellant hoped his palm print was not on the trunk. There was some conversation about whether someone at the car wash would recognize Equarte's car.

Later that afternoon, appellant told Allyson that he had killed a man while trying to steal the man's car at a coin operated car wash. Appellant said it was a "Mexican" guy; they had tried to put him in the trunk of his car, but they could not push the lid of the trunk down because the guy was fighting, and he got out. According to appellant, the

6.

"guy ran back on 'em," they got into a "scuffle," and the gun went off by accident. Appellant told her Bledsaw had the gun, and appellant knew the victim was dead because his chest turned bright orange. Appellant said they ran, got in Equarte's car, and drove back to appellant's apartment.

On the following Monday, Equarte talked with Bledsaw and appellant again after the crime had been covered on the news and it was reported there was a witness. It was suggested that Equarte get out of town, and appellant said he was going to leave for Salt Lake City. Equarte left town on Wednesday, but he was arrested later that day.

## II.    Procedural Background

A criminal complaint was filed against appellant, Equarte and Bledsaw in December 1980, charging them with the first degree murder of Torrez; it also included two special-circumstance allegations. Equarte made a deal with the prosecution, and he testified at a January 1981 preliminary hearing regarding the murder. In May 1981, a first amended information charged appellant and Bledsaw with the murder of Torrez; a personal firearm enhancement was alleged against Bledsaw under section 12022.5; and a prior conviction allegation (§ 667.5, subd. (a)) and a firearm enhancement were alleged against appellant under section 12022, subdivision (a).

In July 1981, appellant entered a plea of guilty to second degree murder; the firearm enhancement and prior conviction allegations were dismissed. In August 1981, appellant was sentenced to 15 years to life for the murder; during sentencing, the court denied appellant's change of plea request.

In 2021, appellant filed a section 1172.6 (formerly § 1170.95) petition seeking resentencing. The court concluded he had made a prima facie showing, and the petition advanced to an evidentiary hearing. Asserting appellant was not entitled to resentencing because he was a major participant in the underlying felony and had exhibited reckless indifference to human life, the prosecution offered into evidence the January 1981 preliminary hearing transcript, the July 1981 change of plea hearing transcript, parole

7.

board hearing transcripts from 2011 and 2021, and a copy of Torrez's death certificate. After admitting the evidence at the evidentiary hearing, the trial court found appellant was ineligible for resentencing and denied the petition.

The trial court agreed with the prosecution's assessment of the evidence in finding appellant was a major participant and that he had acted with reckless indifference to human life under section 189, subdivision (e)(3). The trial court found appellant had played a prominent role in the planning, he did not use or supply the gun that killed Torrez, but he was aware of it. And, he was present at the scene. He actively assisted in trying to force Torrez into the trunk of the car, and he fled the scene after the shooting, despite that he had seen Torrez shot and knew that he was bleeding—he fled to save himself from detection.

Pertaining to reckless indifference, the trial court found appellant ignored the obvious risk to life in confronting the victim, trying to "stuff him into his own car" so that appellant could use the car to rob a bank. The trial court found appellant had targeted a "vulnerable and alone citizen, planned to have the victim on board while a bank was robbed, and while there was no explicit plan to leave the victim to languish after the bank robbery, such a consequence was clearly implied." There was only one weapon, but it was a dangerous, hair triggered shotgun; appellant's apparent recklessness had led Equarte to select Bledsaw to carry the gun; and appellant knew the gun was loaded. Appellant was present at the scene of the killing, and there was no evidence he acted as a restraining influence, which confirmed his willingness to use violence. Appellant did nothing to stop the killing or aid the victim, though opportunities to do so existed. "He was right there with Bledsaw, doing nothing to minimize the possibility of violence though the likelihood of the shooting was announced. And [appellant] fled as the victim was clinging to the final moments of life."

In view of these findings, the court concluded appellant was a major participant in the attempted robbery/carjacking/kidnapping, and he acted with reckless indifference to

human life. Accordingly, appellant's petition for resentencing under section 1172.6 was denied. Appellant now appeals.

## DISCUSSION

### I.     Senate Bill 1437

Senate Bill 1437 was enacted "to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) Senate Bill 1437 amended section 188, which defines malice, and section 189, which defines the degrees of murder to address felony-murder liability. (Stats. 2018, ch. 1015, §§ 2–3.)

Section 188 now provides that, "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person solely based on his or her participation in a crime." (*Id.*, subd. (a)(3).) The change reflects the Legislature's intent that "[a] person's culpability for murder must be premised upon that person's own actions and subjective mens rea." (Stats. 2018, ch. 1015, § 1, subd. (g).)

Senate Bill 1437 also added section 189, subdivision (e), to the Penal Code, which limits the circumstances under which a person may be convicted of felony murder: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) [defining first degree murder] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."

9.

The legislation also added section 1172.6 (former § 1170.95), which provides a procedure by which defendants whose cases are final can seek retroactive relief if the changes in the law would affect their previously sustained convictions. (Stats. 2018, ch. 1015, § 4.) Initially, section 1172.6 (former § 1170.95) permitted those "convicted of felony murder or murder under a natural and probable consequences theory [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts ...." (Stats. 2018, ch. 1015, § 4, subd. (a).)

In Senate Bill No. 775 (2021–2022 Reg. Sess.), effective January 1, 2022, the Legislature amended the language of section 1172.6 (former § 1170.95) to expand the scope of the petitioning procedure. (Stats. 2021, ch. 551, § 2.) Under the amended statute, if the petitioner has made a prima facie case for relief, the court "shall issue an order to show cause." (§ 1172.6, subd. (c).) Within 60 days after the order to show cause has issued, the trial court must then hold a hearing "to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence ...." (*Id.*, subd. (d)(1).)

"At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019. The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a

10.

preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens. A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (§ 1172.6, subd. (d)(3).)

## II. Standard of Review

Relying on *People v. Vivar* (2021) 11 Cal.5th 510 (*Vivar*), appellant argues we should independently review the record because this is a "cold-record case," where the entire factual basis for the decision came from the preliminary hearing transcript. Appellant asserts that cold-record cases not presenting live testimony eliminate the need to defer to the trial court's credibility assessments.

In *Vivar*, the appellant filed a motion to vacate his 2002 conviction under recently enacted section 1473.7, a statute that offers relief to those who have served their sentences and their conviction or sentence is legally invalid due to prejudicial error that affected the defendant's ability to meaningfully understand the actual or potential immigration consequences of a plea. (*Id.*, subds. (a)(1), (e)(1).) (*Vivar, supra*, 11 Cal.5th at p. 517.) The trial court denied Vivar's motion, which was affirmed. Our high court reversed based upon its independent review of the record and concluded the Court of Appeal erred. The court explained its "embrace of independent review in this context" (*id.* at p. 527) was based upon the history of section 1473.7; the interests at stake in a section 1473.7 motion—i.e., "the profound and substantial consequences of a prejudicial misadvisement on a defendant's life" (*Vivar, supra*, at p. 524); the type of evidence on which a section 1473.7 ruling is likely to be based and where the judge adjudicating the

11.

motion may never have participated in the underlying proceedings that occurred years earlier and must rely on a cold record; and the relative competence of trial courts and appellate courts to assess that evidence (*Vivar, supra*, at pp. 526–257).  Additionally, the court pointed out, "[w]hether counsel's advice regarding immigration was inadequate and whether such inadequacy prejudiced the defense, while mixed questions, are predominantly questions of law." (*Id.* at p. 524.)  In a footnote, the court articulated the limited nature of its holding:  "Our decision addresses only the independent standard of review under section 1473.7.  Nothing we say here disturbs a familiar postulate:  when reviewing a ruling under the substantial evidence standard, 'an appellate court should defer to the factual determinations made by the trial court,' regardless of 'whether the trial court's ruling[s are based] on oral testimony or declarations.'" (*Vivar, supra*, at p. 528, fn. 7.)

Multiple courts have declined to extend *Vivar* to govern the standard of review in evidentiary hearings under section 1172.6.  (See *People v. Njoku* (2023) 95 Cal.App.5th 27, 42; *People v. Werntz* (2023) 90 Cal.App.5th 1093, 1109; *People v. Oliver* (2023) 90 Cal.App.5th 466, 480 (*Oliver*); *People v. Sifuentes* (2022) 83 Cal.App.5th 217, 232–233; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 590–591; *People v. Clements* (2022) 75 Cal.App.5th 276, 283, 302.)  These courts have concluded that determining whether a defendant is ineligible for resentencing under section 1172.6 is predominantly a factual question reviewable for substantial evidence.  (*Njoku, supra*, at p. 43 ["Whereas the prejudice issue at the center of *Vivar* was a legal question traditionally afforded independent judgment review [citation], the issue here is a factual one traditionally afforded substantial evidence review [citation]."]; *Werntz, supra*, at p. 1109, review granted ["the questions we face on a review from a court's denial of a section 1172.6 motion are primarily factual" and "the factors that persuaded the court in *Vivar* to apply independent review are not at play here"]; *Oliver, supra*, at p. 480 [distinguishing *Vivar* and concluding "Whether Oliver was a major participant in the underlying felonies who

acted with reckless indifference to human life is predominantly a factual question reviewable for substantial evidence."]; *Sifuentes, supra*, at pp. 232–233 [rejecting independent standard of review and concluding whether the appellant knew or reasonably should have known the victim was a police officer under resentencing statute was predominantly a factual question reviewable for substantial evidence]; *Mitchell, supra*, at pp. 590–591 [distinguishing *Vivar* and concluding "Substantial evidence support[ed] the finding, beyond a reasonable doubt, that Mitchell was a major participant in a felony who acted with reckless indifference to human life."]; *Clements, supra*, at p. 283 [concluding that "trial judge sits as a fact finder at a hearing under [former] section 1170.95, subdivision (d) and that substantial evidence support[ed] the trial judge's finding beyond a reasonable doubt that Clements committed implied malice second degree murder"].)

More recently, our Supreme Court has confirmed the denial of a section 1172.6 petition following an evidentiary hearing is reviewed for substantial evidence. (*People v. Reyes* (2023) 14 Cal.5th 981, 988; accord, *Emanuel, supra*, 17 Cal.5th at p. 885.) "In reviewing the trial court's findings for substantial evidence, we apply well-settled principles. 'We "'examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the necessary fact] beyond a reasonable doubt.'" [ Citation.] Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt.'" (*Oliver, supra*, 90 Cal.App.5th at p. 480.) Reversal is not warranted unless "'"upon no hypothesis whatever is there sufficient substantial evidence to support [the trial court's ruling]."'" (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

## III. Substantial Evidence Supports the Trial Court's Findings

The prosecution asserted the evidence showed appellant was guilty of murder beyond a reasonable doubt under section 189, subdivision (e)(3), as a major participant in the underlying felony and acted with reckless indifference to human life. As noted, Senate Bill 1437 added section 189, subdivision (e), which limits the circumstances under which a person may be convicted of felony murder: "A participant in the perpetration or attempted perpetration of a felony listed in [section 189,] subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested or assisted the actual killer in the commission of murder in the first degree. [¶] (3) the person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."

Section 189, subdivision (e)(3), tracks the language of section 190.2, subdivision (d) (section 190.2(d)), which applies to the felony-murder special circumstance. Under section 190.2(d), a nonkiller who, "with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated" in section 190.2, subdivision (a), which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or life in prison. In 2015 and 2016, the Supreme Court provided guidance as to the meaning of section 190.2(d) in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).

As the Legislature is presumed to know and act against the backdrop of existing case law (*In re Greg F.* (2012) 55 Cal.4th 393, 407), the language of section 189, subdivision (e)(3), as enacted by the Legislature in 2018, necessarily was intended to accord with the interpretation of section 190.2 articulated in *Banks* and *Clark*, as both

14.

opinions were issued at least two years before Senate Bill 1437 was signed into law. (*In re Taylor* (2019) 34 Cal.App.5th 543, 561 (*Taylor*) ["the standard under section 189, subdivision (e)(3) … is the same as the standard for finding a special circumstance under section 190.2(d), as the former provision expressly incorporates the latter"].)

### A. The *Enmund-Tison* Continuum

In *Banks,* the California Supreme Court held that section 190.2(d) was designed to codify the holding in *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*), which articulates the constitutional limits on executing felony murderers who did not personally kill. (*Banks, supra*, 61 Cal.4th at p. 794.) *Banks* explained *Tison* and a prior decision on which it is based, *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*), "collectively place conduct on a spectrum, with felony-murder participants eligible for death only when their involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions." (*Banks, supra*, at p. 794.) As such, section 190.2(d) (and, in turn, § 189, subd. (e)(3)), must be accorded the same meaning. (*Banks, supra*, at p. 794.)

At one end of the continuum is *Enmund* where the defendant's culpability did not meet the constitutional minimum for the death penalty. (*Enmund, supra,* 458 U.S. at p. 801.) There, the defendant identified a robbery victim, planned the crime, and drove armed confederates to the home of the victims. (*Id.* at p. 784; *id.* at p. 803 (dis. opn. of O'Connor, J.).) The confederates shot and killed the robbery victims, and Enmund acted as a getaway driver and helped dispose of the weapons. (*Id.* at pp. 784–787.) The high court held the Eighth Amendment bars the death penalty for any felony-murder aider and abettor "who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." (*Enmund, supra*, at p. 797.) "The intent to commit an armed robbery is insufficient; absent the further 'intention of participating in or facilitating a murder' ([*Enmund, supra*], at p. 798), a defendant who acts as 'the person in the car by the side of the road at the time of the killings, waiting to help the robbers

15.

escape' (*id.* at p. 788) cannot constitutionally be sentenced to death." (*Banks, supra*, 61 Cal.4th at p. 799.) The high court reversed Enmund's death sentence as prohibited by the federal Constitution, concluding Enmund was a "'minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state.'" (*Banks, supra*, at p. 800.)

*Tison* lies at the other end of the continuum, where the defendants' conduct was deemed death-penalty eligible under the federal Constitution. In *Tison*, three brothers (Ricky, Raymond and Donald Tison) assisted their father Gary Tison (who had killed someone in a previous escape attempt) and his cellmate in breaking out of prison, bringing a large arsenal of weapons with them to the prison. (*Tison, supra*, 481 U.S. at pp. 139–140.) In the ensuing escape, "their car, already down to its spare tire, suffered another flat, so the five men agreed to flag down a passing motorist in order to steal a replacement car. Raymond waved down a family of four; the others then emerged from hiding and captured the family at gunpoint. Raymond and Donald drove the family into the desert in the Tisons' original car with the others following. Ricky and the cellmate removed the family's possessions from their car and transferred the Tison gang's possessions to it; Gary and his cellmate then killed all four family members. When the Tisons were later apprehended at a roadblock, Donald was killed and Gary escaped into the desert, only to die of exposure. [Citation.] Ricky and Raymond Tison and the cellmate were tried and sentenced to death. The trial court made findings that Ricky and Raymond's role in the series of crimes was "'very substantial'" and they could have foreseen their actions would "'create a grave risk of … death.'"" (*Banks, supra*, 61 Cal.4th at pp. 799–800 [summarizing the facts of *Tison*].)

In *Banks*, guided by *Tison* and *Enmund*, the court considered "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant …." (*Banks, supra*, 61 Cal.4th at p. 794.) There, Banks and two other men attempted to rob a medical marijuana dispensary. During the attempted robbery, shots

were fired and the three fled.  When a security guard attempted to stop them, Banks shot him twice, killing him.  (*Id.* at p. 795.)  Matthews was acting as the getaway driver, driving the three to the dispensary, waiting for them, and then picking up two of them after the failed robbery and driving them away.  (*Id.* at p. 805.)  In comparing and contrasting the factors the United States Supreme Court had considered in *Tison* and *Enmund*, our high court concluded Matthews was not a major participant in the robbery: there was no evidence of Matthews's role in the planning or procuring of weapons; there was no evidence any of them had previously committed murder, attempted murder, or any other violent crime; Matthews was not present when the shooting took place, and there was no evidence he instigated or could have prevented the shooting.  (*Banks, supra*, at p. 805.)

The court further found Matthews did not act with reckless indifference to human life:  although Matthews knew he was participating in an armed robbery, there was no evidence he "knew his own actions would involve a grave risk of death.  There was no evidence Matthews intended to kill or, unlike the Tisons, knowingly conspired with accomplices known to have killed before.  Instead, as in *Enmund*, Banks's killing of [the security guard] was apparently a spontaneous response to armed resistance from the victim."  (*Banks, supra*, 61 Cal.4th at p. 807.)

The California Supreme Court expanded its discussion of reckless indifference to life in *Clark*.  There, Clark was involved in the attempted robbery of a computer store.  Clark "was the mastermind who planned and organized the attempted robbery and who was orchestrating the events at the scene of the crime."  (*Clark, supra*, 63 Cal.4th at p. 612.)  During the robbery, one of Clark's confederates, shot and killed the mother of a store employee who arrived at the store to pick up her son.  At the time of the shooting, Clark was not at the store, but he drove to the location shortly thereafter and fled when he saw a woman lying on the ground, the police approaching, and the shooter fleeing the scene.  (*Id.* at pp. 537–542, 612–613.)

17.

Clark was convicted of first degree felony murder, and true findings were made on the robbery-murder and burglary-murder special circumstance allegations based on his aiding and abetting liability in the shooting. (*Clark, supra*, 63 Cal.4th at pp. 608–610.) To decide whether Clark was a major participant in the robbery, the court reviewed the factors discussed in *Banks*, but did not decide whether Clark was a major participant because it held the evidence was insufficient to show reckless indifference to life. (*Clark, supra*, at p. 614.)

In reaching this conclusion, the court expanded on factors relevant to the reckless indifference to life analysis: there was only one gun at the scene of the killing, it was not carried by Clark and it was loaded with only one bullet; as Clark was not present at the scene, there was no evidence he had an opportunity to intervene to prevent the killing; Clark's departure was ambiguous as to his mental state concerning the victim's death, and Clark knew police were arriving to aid the victim; the period of interaction between the perpetrators and the victims was designed to be limited; no evidence was presented that Clark knew the shooter had a propensity for violence, and, as he was not at the scene, he had no opportunity to observe the shooter's conduct that might have indicated the shooter was likely to engage in lethal violence; and, finally, there was evidence Clark had taken some steps to minimize the risk of violence during the robbery—the robbery was undertaken after closing time, there were not supposed to be any bullets in the gun, and the gun was actually loaded with only one bullet. (*Clark, supra*, 63 Cal.App.4th at pp. 618–623.)

In *In re Scoggins* (2020) 9 Cal.5th 667 (*Scoggins*), our high court again revisited section 190.2(d). There, the defendant planned an unarmed robbery and assault of a man (Wilson) who had swindled the defendant out of money. (*Scoggins, supra*, at p. 671.) Pursuant to the plan, two of Scoggins's friends (Powell and Howard) would hide inside a van, and then they would jump out and assault Wilson. (*Ibid.*) Scoggins was not going to be involved in the attack, and there was no evidence the plan involved the use of

weapons. (*Ibid*.) In executing the plan, however, Powell pulled out a gun and fired several shots and killed Wilson; Powell and Howard got into a confederate's van and drove away. (*Id.* at p. 672.) Scoggins, meanwhile, waited at a gas station nearby, but exchanged numerous phone calls with Powell and Howard in the hour before the shooting. (*Ibid.*) After the shooting, Scoggins walked over to Wilson, spoke with bystanders and participated in a police interview at the scene. (*Ibid.*)

The court held that Scoggins did not act with reckless indifference to human life: Scoggins did not use a gun, nor did he know one would be used; his plan did not involve shooting Wilson; he was not physically present at the crime scene and was not in a position to restrain Powell once the meeting with Wilson began; Scoggins's view of the scene was obstructed, so he was unaware in real time that Powell was deviating from the original plan; although he was in contact with Powell and Howard by phone, he lacked control over their actions once they arrived at the crime scene, especially given how quickly the shooting occurred; there was no evidence Scoggins instructed his confederates to kill Wilson, or that he directed them to deviate from the plan once they arrived at the crime scene; Scoggins's return to the scene after the shooting reflected ambiguity as to his mindset—it could be inferred that Scoggins walked back to the crime scene because he was unsurprised by the shooting; alternatively, he might have intended to check on Wilson and render aid; the duration of the interaction between the perpetrators and the victim was very limited; and there was no evidence Scoggins knew that Powell or Howard was likely to use lethal force. (*Scoggins, supra*, 9 Cal.5th at pp. 680–681.)

Most recently, in *Emanuel*, our high court considered the reckless indifference standard in the context of section 1172.6. (*Emanuel, supra*, 17 Cal.5th at pp. 885–896.) There, Emanuel and a confederate planned an unarmed robbery where they would meet the victim in a public park in the afternoon and steal his stash of marijuana. When the victim resisted the heist, Emanuel told his cohort, "'let's go'" (*id.* at p. 891), and started

19.

to walk away, but his confederate shot and killed the victim. (*Id.* at pp. 877, 878.) The trial court denied the petition, finding Emanuel was a major participant in the robbery who acted with reckless indifference. The trial court emphasized Emanuel should have done more to prevent the shooting. The appellate court affirmed, and a petition for review was granted. (*Id.* at p. 881.)

Our high court held the facts before it did not support a finding Emanuel carried out the crime with the requisite reckless indifference to human life within the meaning of section 189, subdivision (e)(3). The court highlighted that Emanuel was not armed, and he did not know his confederate was armed or likely to use deadly force—all facts unsupportive of a finding of reckless indifference. (*Emanuel, supra*, 17 Cal.5th at p. 885.) The crime unfolded quickly without any prolonged period of restraint—the short length of the interaction did nothing to heighten the risk of violence beyond that inherent in the robbery itself. (*Id.* at p. 886.) The robbery took place during the day in a public place, circumstances which did not support an objective risk of lethal violence that would have been reasonably anticipated by Emanuel. (*Id.* at p. 889.) When the victim unexpectedly resisted the robbery, Emanuel attempted to act as a restraining influence on his confederate by trying to abandon the plan, which the court found to be "crucial" insights into Emanuel's state of mind. (*Id.* at p. 891.) The court emphasized that it was not incumbent upon a defendant to actually prevent the violence or attempt to do so by any means to demonstrate a lack of a recklessly indifferent mindset, nor does the failure to restrain a cohort weigh in favor of reckless indifference without some evidence the defendant had a meaningful opportunity to do so. (*Ibid.*) Finally, the court found Emanuel's fleeing the scene and failing to aid the victim to be ambiguous as to his mental state—it could have reflected a lack of concern for the victim, or a desire to avoid arrest, or both. (*Id.* at p. 894.) Standing on its own, Emanuel's failure to aid the victim and fleeing was insufficient to demonstrate reckless indifference.

With this legal backdrop in mind, we consider whether there is substantial evidence to support the trial court's finding that appellant was a major participant who acted with reckless indifference to human life.

### B.      Analysis

Appellant contends the evidence is insufficient to show either that he was a major participant or that he acted with reckless indifference to human life.

### 1.      Major Participant

"The ultimate question pertaining to being a major participant is 'whether the defendant's participation "in criminal activities known to carry a grave risk of death" [citation] was sufficiently significant to be considered "major" [citations].'"'" (*Clark, supra*, 63 Cal.4th at p. 611.)  To assist in answering this question, *Banks* articulated the following considerations:  "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?" (*Banks, supra*, 61 Cal.4th at p. 803, fn. omitted.)  "No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Id*. at p. 803.)

On the major participant prong, the trial court found that appellant played a prominent role in planning, he was aware that Bledsaw had a weapon, and he was present at the scene when the murder occurred and participated by trying to force the victim into the trunk.  The court adopted the People's observation that appellant "was intimately involved in the attempted robbery/carjacking/kidnapping.  He actively assisted in trying to stuff Mr. Torrez into his own car.  This type of behavior is fraught with danger."  The

court also adopted the People's assessment that defendant fled the scene after the carnage unfolded to save himself from detection.

Considering the record in the light most favorable to the judgment, there was substantial evidence to support the finding appellant was a major participant. On the first *Banks* factor—the defendant's role in planning the crime—appellant played a primary role. After being unable to find a car that Equarte could steal using his keys, it was appellant who suggested they steal someone's car and put the driver in the trunk; appellant selected Torrez as the target of their kidnapping/carjacking plot, and directed Equarte to pull into the car wash where Torrez was drying his car.

As to the second factor, while appellant did not procure the shotgun and appellant was not armed, he knew Bledsaw was carrying the loaded shotgun. (*Banks, supra*, 61 Cal.4th at p. 803.) With regard to the third factor and the particular dangers posed by the nature of the crime, the weapons used, or past experience or conduct of the other participants (*id.* at p. 811), appellant's plan to obtain Torrez's car was significantly more dangerous than a typical armed robbery—appellant planned to shove Torrez into the trunk of Torrez's car with no plan to release him. The likelihood that a victim would fiercely resist being pushed into the trunk of a car in the middle of the day in July in Fresno where temperatures routinely soar above 100 degrees (and in a populated city where people were awake and could view the crime) was substantially likely and highly foreseeable, and elevated the risk to human life beyond those inherent in any armed robbery. (*Clark, supra*, 63 Cal.4th at p. 623.) While there was no evidence appellant knew Bledsaw had any violent history or propensity to shoot Torrez, the situation itself presented a grave risk of resistance and the need to meet that resistance with lethal force.

Considering the fourth factor and the defendant's presence at the scene (*Banks, supra*, 61 Cal.4th at p. 803), appellant was with Bledsaw at the scene of the murder, he worked with Bledsaw to try to get Torrez into the trunk of the car, and appellant saw Torrez get shot. Equarte heard appellant say "'Let's go'" before Bledsaw fired his

weapon, but he did not try to intervene when Bledsaw turned to Torrez and told him to "'Get back,'" nor did he urge Bledsaw to go at that point or tell him to stop.

Notably, appellant fled the scene with Bledsaw when he saw Torrez had been shot and was bleeding, rendering no aid. (*Banks, supra*, 61 Cal.4th at p. 803 [considering what the defendant did after lethal force was used].) Appellant argues he thought Torrez was dead from the shot, and thus no aid given by appellant would have changed the outcome. Moreover, the crime was committed during the day with people around, thus the victim would likely receive some aid from someone, which is what happened.

For purposes of the major participation analysis and distinct from his mental state, appellant's conduct after lethal force was used is relevant: appellant rendered no aid after seeing Torrez was shot; instead, he fled, drove with the others to Solomon's house where they got rid of the weapon, and reassured Bledsaw he would have done the same thing— suggesting they were full partners in the crime. (See *In re Harper* (2022) 76 Cal.App.5th 450, 462 [evidence the defendant was "close enough [to the murder scene] to hear the gunshot," but "did not go back inside and try and help the [victim]," and instead carried stolen merchandise out to the car weighed in favor of a finding of major participation].) This postlethal force conduct could reasonably be viewed, in concert with the other *Banks* factors, as elevating the degree of appellant's participation in the underlying crime and his culpability under the totality of the circumstances.

In sum, the evidence strongly supports a finding that appellant was a major participant. He was the primary planner for the kidnapping/carjacking, and the plan significantly elevated the risk of resistance beyond that attendant to an armed robbery or a kidnapping where the victim is not forced into such obviously dangerous confinement; he selected the victim; he participated in trying to wrestle Torrez into the trunk; he was at the scene of the murder the entire time and he saw Bledsaw shoot Torrez; he did not attempt to intercede when Bledsaw turned and yelled at Torrez to "'Get back'"; and he did not render any aid to the victim afterwards, he fled with the group, got rid of the

weapon, and reassured Bledsaw he would have done the same thing—suggesting they were full partners in the crime. (See *People v. Mitchell* (2022) 81 Cal.App.5th 575, 591 [full partners at every stage of the crime, including splitting the proceeds of the robbery equally with the shooter, supported major participant finding].)

### C. Reckless Indifference

We turn next to consider whether appellant acted with the requisite mental state, examining the record for "sufficient evidence of ""reasonable, credible, and of solid value"" to 'support a finding beyond a reasonable doubt'" that appellant acted with reckless indifference. (*Clark, supra*, 63 Cal.4th at p. 618; accord, *Emanuel, supra*, 17 Cal.5th at p. 885.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) Even where the evidence is primarily circumstantial, if "the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also be reconciled with a contrary finding does not warrant the judgment's reversal." (*Id.* at p. 358.)

To determine whether a defendant acted with reckless indifference to human life, we "look to whether a defendant has '"knowingly engag[ed] in criminal activities known to carry a grave risk of death."'" (*Banks, supra*, 61 Cal.4th at p. 801.) "The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Ibid.*) Although "'there are some felonies as to which one could properly conclude that any major participant necessarily exhibits reckless indifference to the value of human life'" (*Clark, supra*, 63 Cal.4th at p. 615, quoting *Tison, supra*, 481 U.S. at p. 158, fn. 12), such as "'the manufacture and planting of a live bomb,'" armed robbery is not among them (*Clark, supra*, at p. 615, quoting *Banks, supra*, at p. 810, fn. 9). "Reckless indifference 'encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not

24.

specifically desire that death as the outcome of his actions.'" (*Scoggins, supra*, 9 Cal.5th at pp. 676–677, quoting *Clark, supra*, at p. 617.)

"Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, '"[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."' [Citations.] 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death"' satisfies the statutory requirement." (*Scoggins, supra*, 9 Cal.5th at p. 677.)

In *Clark*, the court articulated the following considerations for determining whether a defendant acted with reckless indifference to human life: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*Scoggins, supra,* 9 Cal.5th at p. 677 [listing factors set forth in *Clark, supra*, 63 Cal.4th at pp. 618–623].)

The reckless indifference considerations '"significantly overlap"' with the major participant considerations, '"for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life."' (*Clark,*

*supra*, 63 Cal.4th at p. 615.)  As with the major participant considerations, "'[n]o one of [the reckless indifference] considerations is necessary, nor is any one of them necessarily sufficient.'"  (*Id*. at p. 618.)  "We analyze the totality of the circumstances to determine whether [the defendant] acted with reckless indifference to human life."  (*Scoggins, supra*, 9 Cal.5th at p. 677.)

Considered in light of *Emanuel*, we are unpersuaded the trial court's reckless indifference finding is unsupported under the totality of the circumstances presented here.

### 1. Duration of the Crime

In considering whether a defendant exhibited a recklessly indifferent mindset, *Clark* explained that courts "have looked to whether a murder came at the end of a prolonged period of restraint of the victims by [the] defendant" (*Clark, supra*, 63 Cal.4th at p. 620, fn. omitted) because "[w]here a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder" (*ibid.*).  The robbery plan appellant presented to his cohorts involved kidnapping a driver with the use of an especially dangerous gun, taking the driver's car, and holding the driver for an apparently unlimited duration in the trunk of that car on a July afternoon in Fresno—there was no plan to release the driver after the robbery.

In attempting to execute this plan, the victim appellant chose responded with such vigorous resistance that Bledsaw and appellant could not shove him in the trunk, despite Torrez's relatively diminutive size (estimated by Equarte and Edward to be around 100 pounds).  The exact duration of Bledsaw and appellant's physical struggle with Torrez is unknown, but Edward testified it occurred over the course of about 7 to 10 minutes, while Equarte estimated the time between Bledsaw and appellant leaving the car until he heard appellant saying "'Let's go'" was about three minutes.  In the end, the altercation with Torrez lasted only minutes and, thus, the duration factor is neutral.  However, we hasten to note, that while the duration of the struggle did not necessarily

heighten the risk of violence, the crime's *planned* duration exponentially increased the likelihood of the victim's death in the trunk of a hot car. A factfinder could reasonably conclude the degree and duration of Torrez's resistance was likely influenced by the obvious lethal dangers of what appellant and Bledsaw were trying to force Torrez to do. Thus, while we conclude the duration factor is neutral given that the actual struggle with Torrez lasted only minutes (*Emanuel, supra*, 17 Cal.5th at p. 886), we consider the planned lengthy duration of the crime as part of appellant's failure to minimize the risks of violence.

### 2. Use or Awareness of the Presence of Weapons and Knowledge of Cohort's Likelihood of Killing

As to evidence of appellant's awareness of the presence of weapons and his knowledge of Bledsaw's propensity for violence (*Clark, supra*, 63 Cal.4th at pp. 618–619, 621), appellant himself was not armed with a gun or other weapon, he had not supplied the shotgun to Bledsaw, and his plan for the crime did not involve shooting Torrez. Nevertheless, appellant knew Bledsaw was armed with a loaded gun that had a highly sensitive trigger. (See *id*. at p. 618 [where accomplices bring weapons to the scene of the crime can weigh in favor of a finding of reckless indifference to life].)

"A defendant's willingness to engage in an armed robbery with individuals known to him to use lethal force may give rise to the inference that the defendant disregarded a 'grave risk of death.'" (*Clark, supra*, 63 Cal.4th at p. 621.) Here, there is no evidence appellant knew that Bledsaw had any propensity or reputation for violence. (*Ibid.* [the petitioner did not act with reckless indifference to human life, in part, because "no evidence was presented at trial that [the confederate] was known to have a propensity for violence, let alone evidence indicating that [the] defendant was aware of such a propensity"]; *In re Bennett* (2018) 26 Cal.App.5th 1002, 1025 (*Bennett*) [finding "'significant'" the lack of evidence that the petitioner knew of his confederates' "violent propensities"].) Nonetheless, the reason Equarte wanted Bledsaw to carry the gun was

due to *appellant's* reputation for recklessness and Equarte's concern appellant would use the gun if he was carrying it. While appellant and Bledsaw had conducted at least three prior armed robberies together, and there is no evidence anyone was shot or hurt during those robberies, the crime appellant planned was completely different: they were planning to first assault and kidnap a victim with the use of a gun, and then force the victim into the trunk of a car at the height of summer (July) for the entire course of the bank robbery with no plan or discussion to release the victim from the trunk after the robbery.

While appellant may not have had knowledge of Bledsaw's propensity to use the gun, a reasonable factfinder could conclude appellant's plan to assault and kidnap the victim vastly increased the likelihood of fierce resistance and responding lethal force, and appellant's own conduct in helping Bledsaw try to force the victim into the trunk precipitated the gun's ultimate use. These facts, in conjunction with appellant's knowledge of Bledsaw's gun, tend to support a conclusion appellant acted with a recklessly indifferent mindset.

### 3. Efforts Taken to Minimize the Risk of Violence

Turning to evidence minimizing the risk of violence, efforts at the planning stage to minimize the potential for violence may, but do not necessarily, bear on reckless indifference. Given the two-part nature of the reckless indifference standard, "'[t]he existence of efforts to minimize violence does not necessarily foreclose a finding of reckless indifference to human life ….'" (*Emanuel, supra*, 17 Cal.5th at p. 888, quoting *Scoggins, supra*, 9 Cal.5th at p. 682.) "Where an 'objective evaluation of the circumstances' of the crime suggests the risk of violence is grave, the defendant's apparent efforts to minimize that risk may be unavailing." (*Emanuel, supra*, at p. 888, quoting *Scoggins, supra*, at p. 683.) "Conversely, the absence of such efforts does not necessarily evince a subjective disregard for risk where the objective circumstances of the

planned crime suggest the risk of violence posed is no more than that inherent in any violent felony." (*Emanuel, supra*, at p. 888, citing *Scoggins, supra*, at p. 679.)

Here, a factfinder could reasonably conclude the circumstances of the crime objectively posed an extremely heightened and obvious risk to life that appellant subjectively disregarded and took no meaningful steps to minimize. As the trial court found, appellant's plan for the carjacking and kidnapping the victim with no plan of release posed obvious and heightened risks of death. The entire plan, which was formulated and substantially carried out by appellant, demonstrates a recklessly indifferent mindset from the outset: appellant's plan required immediate resort to violence by physically assaulting a victim while using a hair-triggered shotgun for the purpose of an extended-duration kidnapping, elevating the risk of violence far above that inherent in any violent felony. Beyond that, the plan called for coercing the victim into the trunk of a car, a life-threatening environment in the summer, without any plan for the victim's release from the trunk, substantially increasing the risk of the victim's death via heat exposure. Given the obvious and lethal peril associated with confinement in the trunk of a vehicle in excessive July afternoon heat, the likelihood of the victim's resistance to being shoved into the trunk of a car was exponentially increased—despite that appellant sought a more vulnerable victim who might put up less of a fight. While the daytime occurrence of the crime in a public place could tend to deter Bledsaw from using the gun, neither appellant nor Bledsaw saw fit to unload the gun—rather, appellant planned a necessarily violent physical confrontation for purposes of an extended-duration kidnapping in the trunk of a car with the aid of a loaded, hair-trigger shotgun carried by Bledsaw.

**4.      Physical Presence at the Scene and Opportunity to Restrain Confederates or Aid the Victim**

The final factor to consider is whether appellant was physically present at the crime scene and whether he had opportunities to restrain the crime or aid the victim.

(*Clark, supra*, 63 Cal.4th at p. 619.) Physical presence may be highly relevant to a defendant's culpability because it could demonstrate the murder was the culmination or a foreseeable result of several intermediate steps—it may show the defendant observed his cohorts and that he shared in their actions and mental state; and it may show the defendant had an opportunity to act to restrain his cohorts or aid the victim after the shooting. (*Ibid.*) It is undisputed appellant was present at the scene of the murder, unlike the defendants in *Enmund*, *Banks*, *Clark*, and *Scoggins*. Indeed, appellant was physically present "during the entire sequence of events culminating in the murder[]." (*Clark, supra*, at p. 619.) Not only that, he came up with the plan to carjack a driver and put the driver in the trunk of the car; he searched with the group for a victim; he selected Torrez while they were driving around and directed Equarte to the car wash; and he participated with Bledsaw in violently assaulting Torrez, attempting to shove him into the trunk of the car. A factfinder could reasonably conclude from this evidence that appellant not only planned the crime, which called for the immediate use of violence against the victim with the goal of subjecting the victim to life-threatening confinement in a car trunk, he took the lead in carrying out the plan, and his actions, together with Bledsaw's, precipitated the victim's fierce resistance and Bledsaw's ultimate use of the gun that appellant knew was loaded and had a sensitive trigger—i.e., it was a particularly dangerous firearm.

Also relevant is whether appellant acted "'as a restraining influence on [his] murderous cohort[].'" (*Clark, supra*, 63 Cal.4th at p. 619.) "'If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.'" (*Ibid.*) In the face of Torrez's resistance and their inability to force him into the trunk, appellant told Bledsaw, "'Let's go.'" In isolation, this fact might suggest appellant was attempting to restrain the crime and did not hold a recklessly indifferent mindset. (See *Emanuel, supra*, 17 Cal.5th at pp. 879, 891 [after the victim refused to acquiesce to the robbery, the defendant started walking away, telling his confederate they

should go; under the circumstances, this showed the defendant was acting as a restraining influence on his confederate and was not evidence of a recklessly indifferent mindset].)

Here, however, when viewing the circumstances as a whole, a reasonable factfinder could conclude this statement was not meant to act as a restraining influence, nor did it reflect the lack of a recklessly indifferent mindset. Torrez's kidnapping and carjacking were only the first steps in carrying out the bank robbery, which was the group's ultimate goal. Appellant's sudden call to give up in the face of Torrez's unexpectedly successful resistance could be viewed as an attempt not to draw outside attention to the struggle with Torrez, which according to Edward, a percipient witness, involved a lot of yelling and occurred in the middle of the day at a public-facing business.

Viewed through that lens, a factfinder could reasonably view appellant's statement to Bledsaw as an effort not to get caught during the kidnapping/carjacking gambit, rather than any concern for Torrez's safety or to deescalate the situation so no one would get hurt. Afterall, just moments before appellant called to Bledsaw to go, the two men were violently trying to shove Torrez into the trunk of a car on a summer afternoon with no plan for his release, showing no concern for the threat this posed to Torrez's life—under these circumstances, appellant's attempt to get Bledsaw to leave reasonably could be viewed as an effort to salvage the robbery plan, not an attempt to restrain the crime for the sake of Torrez's well-being. (*People v. Jones* (1990) 51 Cal.3d 294, 314 [under substantial evidence review, appellate court draws all reasonable inferences from the evidence that support the factfinder's verdict].)

Pursuant to *Emanuel*, appellant's decision not to aid Torrez, despite knowing he had been shot and instead fleeing the scene following the shooting, is ambiguous and does not constitute substantial evidence of appellant's mindset. (*Emanuel, supra*, 17 Cal.5th at p. 894.) Appellant's flight without rendering aid could just as easily have been compelled by his fear of getting caught as any ambivalence over Torrez's condition. Moreover, the shooting occurred in public in the middle of the afternoon where appellant

31.

knew others would hear the shooting and could summon aid for the victim. Nothing about appellant's conduct after Torrez was shot prevented or delayed Torrez from receiving aid. (*Ibid.*; cf. *Tison, supra*, 481 U.S. at pp. 140–141 [the defendants abandoned the victims in a remote desert and disabled their only available chance of survival evidenced reckless indifference]; cf. *In re Harper* (2022) 76 Cal.App.5th 450, 457, 465 [after hearing gunshot, the defendant did nothing to aid the victim, and left the victim hidden away in a bathroom where he was unlikely to be found quickly].)

### 5. Totality of the Circumstances

Considering the foregoing, there are several key factors, supported by substantial evidence, that weigh strongly in favor of the trial court's reckless indifference finding. Appellant was heavily involved in planning the crime, and it was his idea to carjack and kidnap a driver and attempt to violently wrestle the driver into the trunk on a hot summer afternoon with no plan to release the driver so they could use the stolen car for the robbery without it being reported. This plan not only elevated the risk of victim resistance and the likelihood of a deadly response far above the risks implicit in any violent crime, it demonstrated a mindset recklessly indifferent to human life at the outset: first assaulting and kidnapping a victim with the use of an especially dangerous gun; and then to forcing the victim into the trunk of a car on a summer day in Fresno where temperatures routinely exceed 100 degrees with no plan for the victim's release—all of which clearly and substantially increased the victim's risk of death far beyond the lethal risk generally attendant to any violent crime.

Moreover, appellant not only took the lead in planning, he selected the victim and directed Equarte to pull into the car wash. Appellant did not stay in the car—he was present on the scene of the murder with Bledsaw the entire time, knowing his cohort was armed with a loaded shotgun that had a hair trigger, and he participated actively. He personally tried to force Torrez into the trunk of the car, and he saw Bledsaw shoot Torrez—he saw Torrez's wound and the blood. Although appellant said, "'Let's go'"

32.

before the shooting, the evidence is susceptible to an interpretation appellant was not attempting to restrain the crime so much as attempting to avoid detection and salvage the robbery plan.

These facts are meaningfully distinguishable from *Emanuel*. In that case, there was no evidence Emanuel knew his confederate possessed a gun, would bring that gun to the robbery, or was likely to use lethal force. (*Emanuel, supra*, 17 Cal.5th at p. 885.) Here, by contrast, appellant knew Bledsaw was carrying a shotgun with a hair trigger and, pursuant to appellant's plan, he and Bledsaw initiated a violent attack on Torrez to get him into the trunk of the car. Given the obvious life-threatening risk the nature of this kidnapping posed to Torrez, the plan increased the risk Torrez would resist, which, in turn, increased the likelihood of a deadly response from Bledsaw. Unlike the circumstances in *Emanuel*, which indicated the defendant was attempting to restrain the crime and walk away, appellant initiated a violent attack on the victim, planned to subject the victim to imminently life-threatening conditions of extended duration with no concern about his release or the threat to the victim's life, and then called to Bledsaw to go only after a loud fight with the victim that could draw attention. Appellant's plan, and the manner in which it was carried out, support a finding appellant acted with a recklessly indifferent mindset.

These facts also distinguish this case from those that appellant cites. In *In re Miller*, the defendant was a spotter in a "'follow-home'" robbery scheme where the defendant identified a victim at a bank, alerted his cohorts in a car, and the cohorts followed the victim and robbed her while shooting and killing her companion. (*In re Miller* (2017) 14 Cal.App.5th 960, 964–965 (*Miller*).) Notably, there was no evidence the defendant in *Miller* knew a gun would be used; he was absent from the scene of the killing and therefore had no opportunity to stop it or help the robbery victim's companion; the shooting was impulsive after the shooter was confronted; and there was no evidence the defendant knew the shooter was likely to kill. (*Id.* at pp. 975–976.)

Nothing about the crime elevated the risk to human life beyond those inherent in any armed robbery, and the court found the evidence insufficient to support the special circumstance finding. (*Id.* at pp. 976–977.)

In *Bennett*, the defendant developed a plan with cohorts to rob a drug dealer. (*Bennett, supra*, 26 Cal.App.5th at p. 1008.) The defendant stayed in the car while his cohorts confronted, chased, shot and killed the drug dealer. (*Id.* at pp. 1008–1009.) Although the evidence established the defendant participated in planning the robbery (*id.* at p. 1019), he was instrumental in carrying it out because he used his connection to the drug dealer to initiate the meeting (*ibid.*), and he knew his cohorts were armed (*id.* at p. 1020), he did not accompany his cohorts to confront the dealer, he did not see the shooting occur and, thus, could not act as a restraining force, and shooting the dealer was not part of the plan (*id.* at pp. 1023–1024). The court concluded the evidence was insufficient to support that the defendant was a major participant who acted with reckless indifference to life. (*Id.* at p. 1026.)

In *Taylor*, the defendant and his cohorts planned to rob a store clerk while she was making a night deposit of the day's receipts. (*Taylor, supra*, 34 Cal.App.5th at pp. 547–548.) The defendant drove the group to the store, his cohort got out of the car and confronted and shot the victim out of sight of the group's vehicle. (*Id.* at p. 548.) The court concluded the defendant had not acted with reckless indifference because, although he planned the robbery and there was evidence he knew his cohort had a gun, he had planned a quick confrontation with a lone employee after the store had closed, reducing the risk of violence (*id.* at p. 558); the duration of the planned robbery was short (*ibid.*); the defendant did not have information the shooter had a violent history (*ibid.*); and, significantly, the defendant never got out of the car and had no opportunity to prevent the shooting (*id.* at p. 559).

Differently here, appellant planned a significantly more dangerous confrontation than a quick robbery. Nothing about the planned crimes in *Miller*, *Bennett* or *Taylor* was

even close—they each involved plans for a quick robbery and nothing more. Appellant planned a kidnapping of significant duration with no design to release the victim. The ambush of Torrez was committed in broad daylight in the middle of a city on a Thursday—there were people around and awake, the crime could be (and was) viewed by onlookers, and, thus, the victim (especially upon being shoved into the trunk of a car) would have every conceivable reason to resist even in the face of the gun, increasing the risk of violence. There was evidence permitting an inference appellant subjectively appreciated the elevated risks inherent in his carjacking/kidnapping plan: the group had discussed finding an older person who would not fight back, and appellant ultimately selected a smaller victim who, by inference, he viewed to be more easily overpowered.

Additionally, and importantly, appellant participated fully at the scene, and was there when Bledsaw shot Torrez, a fact completely absent in *Miller*, *Bennett* and *Taylor*, where none of the defendants were directly at the scene when the murder was committed. Although Equarte testified appellant was already back in the car when Bledsaw turned to Torrez and warned him before shooting, that testimony was in conflict with Edward's testimony that both of Torrez's assailants were visible to him when Torrez was shot and they took off running after shooting Torrez. Moreover, appellant told his girlfriend he saw the shooting and the blood on Torrez—something he would not have seen had he been back at the car with Equarte. It is not unreasonable, given this evidence, for a trier of fact to conclude appellant was not in the car when Bledsaw shot Torrez, and we must accept this view of the evidence under a substantial evidence standard of review. (*People v. Zamudio, supra*, 43 Cal.4th at p. 357 [in applying substantial evidence test, we review evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the trier of fact could reasonably have deduced from the evidence].) It is unclear how much time appellant had to interject when Bledsaw warned Torrez just before shooting him, and, thus, we do not consider it evidence supporting a reckless indifference finding (*Emanuel, supra*, 17 Cal.5th at pp. 891–892),

35.

but we note appellant stood by silently while Bledsaw shot the victim, and later said he would have done what Bledsaw had done with respect to the shooting.

There are circumstances that do not support a finding of reckless indifference—there was no evidence appellant knew that Bledsaw had any violent tendencies or history, and the actual assault on Torrez did not occur over a lengthy amount of time. Yet, on balance, the factors taken together amply supply substantial evidence to support the trial court's finding appellant acted with reckless indifference to human life in carrying out the crime.

## A. Conclusion

Viewing the totality of the circumstances, there was substantial evidence to support the trial court's findings appellant was a major participant. Further, even reconsidering the matter under *Emanuel*, we conclude substantial evidence supports the trial court's finding appellant acted with reckless indifference to human life.

## DISPOSITION

The trial court's October 19, 2022, order denying the petition is affirmed.